RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0214p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

WALTER JONES,

        *Plaintiff-Appellee,*

    *v.*

PATRICIA L. CARUSO, *et al.*,

        *Defendants-Appellants.*

No. 07-2393

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-72817—Denise Page Hood, District Judge.

Submitted: March 4, 2009

Decided and Filed: June 23, 2009

Before: KEITH, COLE, and McKEAGUE, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:** Linda Olivieri, ASSISTANT ATTORNEY GENERAL, Lansing, Michigan, for Appellants. Walter Jones, Kincheloe, Michigan, pro se.

    COLE, J., delivered the opinion of the court, in which KEITH, J., joined. McKEAGUE, J. (pp. 31-35), delivered a separate dissenting opinion.

_____

**OPINION**

_____

    COLE, Circuit Judge. Defendants-Appellants Patricia L. Caruso, Director of the Michigan Department of Corrections ("MDOC"), Linda Matuszak, the Record Office Supervisor at Saginaw Correctional Facility, and Jan E. Trombley, the Warden at Saginaw Correctional Facility (collectively, "Defendants"), appeal the district court's denial of their motion to reconsider its order enjoining them from enforcing subsection (HH)(23) ("Rule 23") of MDOC Policy Directive ("MDOC PD") 05.03.118 ("Prisoner Mail"), which pro se

1

Plaintiff-Appellee Walter Jones claims infringes on his First Amendment and Due Process rights. MDOC PD 05.03.118, which became effective on March 19, 1985, sets forth MDOC's guidelines for prisoners' mail rights. The directive includes a list of prohibited materials prisoners "shall not be allowed to receive . . . as they are considered to be a threat to the order and security of an institution or to the rehabilitation of prisoners." MDOC PD 05.03.118(N).

This case relates to Rule 23 of the policy directive, which specifically regulates prisoners' possession of UCC-related materials. Defendants argue that the district court's injunction should be dissolved because: (1) the district court mistakenly found UCC-related materials to be "legal mail" subject to heightened First Amendment protections; (2) the district court erred in finding that Rule 23 is not rationally related to the legitimate penological objective of maintaining order and discipline in MDOC prisons; (3) the district court erred in finding that Rule 23's scholarly-materials exception did not alleviate First Amendment concerns; (4) the district court's issuance of the injunction interfered with the "well-supported judgment of prison officials"; and (5) the district court erroneously applied the standard for the issuance of preliminary injunctions. Jones counters that: (1) this Court cannot consider arguments that Defendants have raised for the first time on appeal; (2) Defendants have regulated their UCC ban through other MDOC directives, obviating the need to dissolve the injunction; and (3) the district court properly determined that the facts met the standard for issuance of a preliminary injunction. Although the district court abused its discretion in applying the incorrect level of scrutiny to analyze Rule 23, for the following reasons, we **AFFIRM** the district court's preliminary injunction on its merits and **REMAND** the case to the district court for further consideration not inconsistent with this opinion.

## I. BACKGROUND

### A.     Factual Background

#### 1.     *Development of Rule 23*

Since 2004, there has been a nationwide increase in the number of filings by prison inmates of unsubstantiated liens and Uniform Commercial Code ("UCC") financing statements against state or federal officials involved with their incarceration. *See, e.g.*,

*United States v. Gordon*, No. CV205-158, 2005 WL 2237640, at *1-2 (S.D. Ga. Aug. 25, 2005) (finding that prisoners filed "facially absurd" liens and UCC financing statements designed to harass and intimidate government officials in the performance of their duties); *United States v. Orrego,* No. 04 CV 0008 SJ, 2004 WL 1447954, at *2-3 (E.D.N.Y. June 22, 2004) (granting government's motion for summary judgment where prisoner purported to copyright his name, after which he filed fraudulent liens against various government officials for using his name without permission or payment); *Ray v. Williams*, No. CV-04-863-HU, 2005 WL 697041, at *2 (D. Or. Mar. 24, 2005) (granting government's motion for summary judgment where prisoner submitted UCC filings against government officials, seeking payment for unauthorized use of his copyrighted name); *United States v. Martin*, 356 F. Supp. 2d 621, 626-27 (W.D. Va. 2005) (finding "null and void" prisoner's fraudulent UCC financing statements naming himself as the secured party for a $108,000,000.00 debt purportedly owed to him by various government officials); *United States v. Brum*, No. CIV. A. 105CV110, 2005 WL 1606584, at *3 (E.D. Tex. July 1, 2005) (granting government's motion for summary judgment where prisoner filed fraudulent liens and UCC financing statements against the judge and prosecutor involved in his criminal conviction); *Cooperwood v. McDonald*, No. 2:05 CV 111, 2005 WL 1427718, at *2-4 (W.D. Mich. June 13, 2005) (dismissing prisoner's civil rights action under the Prison Litigation Reform Act where prisoner filed a fraudulent lien "for infringement of his copyrighted name"); *United States v. Stouder*, No. 3:04-1044, 2005 WL 2715666, at *3-5 (M.D. Tenn. Sept. 2, 2005) (declaring null and void prisoner's fraudulent UCC financing statements against government officials in the amount of $300,000,000.00).

On March 30, 2004, in response to increased activity by Michigan prisoners engaging in these types of fraudulent schemes, MDOC Director, Defendant Caruso, used her authority to establish policy through a Director's Office Memorandum ("DOM") and enacted DOM 2004-8, "Fraudulent Activities Involving the Uniform Commercial Code." *See Jones v. Mich. Dep't of Corrs.*, No. 05-CV-72817-DT, 2006 WL 2805643, at *1 (E.D. Mich. Sept. 28, 2006).[1] On January 1, 2005, DOM 2004-8 was superseded by DOM 2005-4, which also restricted prisoners' use of UCC publications in an effort to confront "increased

---

[1]Unless the MDOC Director renews a DOM, it is effective only for the calendar year in which it is issued.

activity by prisoners engaging in various schemes involving the UCC." (Joint Appendix ("JA") 82-83). Also, on March 30, 2005, prison officials approved Housing Unit Rule #45 ("Rule 45"), a policy, which, like DOM 2004-8 and DOM 2005-4, declared that MDOC would consider UCC-related materials to be "contraband" subject to seizure because prisoners could use those materials to facilitate criminal activity.

On June 6, 2005, DOM 2005-4 was superseded by MDOC PD 05.03.118(HH)(22) ("Rule 22"), prohibiting certain types of incoming mail. Rule 22 stated:

> PROHIBITED INCOMING MAIL
>
> HH.    Prisoners are prohibited from receiving mail that is a threat to the security, good order, or discipline of the facility, may facilitate or encourage criminal activity, or may interfere with the rehabilitation of the prisoner. The following pose such risks within a correctional facility under all circumstances and therefore shall be rejected.
>
> > * * *
>
> > 22.    Mail regarding actions that can be taken under the Uniform Commercial Code (UCC). This does not include legal materials which set forth the statute or provide a scholarly legal analysis of the UCC.

(JA 21.) Rule 22 prohibited prisoners from receiving and possessing certain UCC-related materials but was interpreted by the MDOC officials as making exceptions for UCC-related publications held in the prison law library, such as the Michigan Compiled Laws Annotated or scholarly analyses of the relevant statutes. *See Jones*, 2006 WL 2805643, at *2. MDOC officials also interpreted Rule 22 as preventing prisoners from using funds from their personal institutional accounts to purchase prohibited UCC materials and required MDOC staff to reject such items that a prisoner received through the mail and to confiscate such items that a prisoner already possessed. *Id*.

On January 1, 2006, MDOC amended MDOC PD 05.04.118(HH), such that subsection HH(22) now states (in renumbered sub-paragraph 23 ("Rule 23")):

> 23.     Mail regarding actions that can be taken under the Uniform Commercial Code (UCC) *which could be used to harass or threaten another individual, including the filing of a lien against the individual.* This does not include legal materials which set forth the statute or provide a scholarly legal analysis of the UCC.

(JA 397) (emphasis added).  MDOC also sought legislation that would make inmates' UCC abuses punishable as criminal offenses, and, in 2004, it became a felony in Michigan to knowingly and intentionally file a false or fraudulent financing statement with the Secretary of State under the UCC.  *See* Mich. Comp. Laws § 440.9501(6) (2004).[2]

### 2.     Enforcement of Rule 23 against Jones

Jones is currently serving a life sentence in the custody of MDOC.  After MDOC enacted DOM 2004-8, Jones notified prison officials that he possessed books, pamphlets, forms, and other literary materials that referenced usage of the UCC regulations but were not associated with criminal or fraudulent activity.  On February 10, 2005, Jones attempted to send a letter to the Michigan Secretary of State seeking forms related to Michigan copyright and trademark registration laws.  On February 14, 2005, Jones's metered envelope was returned to him without the letter.  Jones then filed grievances based on Defendants' enforcement of DOM 2004-8 and their alleged failure to provide him with reasons for confiscating his correspondence.  After exhausting the applicable MDOC grievance procedures, Jones filed the instant suit.

---

[2]Section 440.9501(6) provides:

> A person shall not knowingly or intentionally file a false or fraudulent financing statement with the office of the secretary of state under subsection (1)(b) or (2).  In addition to any other penalty provided by law, a violation of this subsection is a felony punishable by imprisonment for not more than 5 years or a fine of not more than $2,500.00, or both.  If the person is convicted of the violation, the court may find that the financing statement is ineffective and may order the office of the secretary of state to terminate the financing statement and may order restitution.

Mich. Comp. Laws § 440.9501(6).

**B.　　Procedural history**

Jones filed his complaint on July 19, 2005, alleging under 42 U.S.C. § 1983, that DOM 2004-8 suppresses communication and is facially overbroad in violation of the First Amendment.  Because DOM 2004-8 was superseded by Rule 22, the magistrate and district judges construed Jones's claims as arising from Rule 22.  *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (granting liberal construction to pro se filings); *Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985) ("The allegations of a pro se petition, 'though vague and conclusory, are entitled to a liberal construction.'").

Jones sought the following relief: (1) a declaratory judgment stating that DOM 2004-8 and Rule 45 were unconstitutional under the First and Fourteenth Amendments to the Constitution; (2) an injunction to prevent MDOC's enforcement of both DOM 2004-8 and Rule 45; (3) an injunction requiring Defendants to notify Jones when they confiscate or reject his outgoing mail; (4) compensatory damages of $800; and (5) punitive damages of $950.  Defendants moved for summary judgment.  In support of their motion for summary judgment, Defendants attached evidence showing that Michigan prisoners were filing fraudulent liens.  Specifically, Defendants' Exhibit C to their Motion for Summary Judgment consists of eighteen pages of documents including correspondence from the Michigan Secretary of State's office; copies of "Common-Law Copyright & Trade-Name/Trademark Self-Executing Contract/Security Agreement in Event of Unauthorized/Unlawful Use" purporting to allow a prisoner to claim a trademark interest in his own name; newspaper advertisements purporting to assert a copyright interest in a prisoner's name; a complaint against an MDOC employee for violation of a prisoner's contractual rights, and an assertion of a debt of $6,000,000 against an MDOC employee for alleged abuses of a prisoner's copyrighted name.

On July 10, 2006, the magistrate judge issued a Report and Recommendation ("R&R"), which recommended that the district court grant Defendants' motion for summary judgment as to Defendants Caruso, Trombley, and Matuszak in their individual capacities based on qualified immunity.  However, the magistrate judge recommended the denial of Defendants' motion to dismiss Jones's request for injunctive relief against

them in their official capacities and that the district court issue a temporary restraining order enjoining MDOC's enforcement of Rule 22. The magistrate judge concluded that Jones had demonstrated a likelihood of success on the merits of his claim that Rule 22 violated his First Amendment rights and was also unconstitutionally vague and overbroad.

Defendants objected to the R&R, contending that Jones's claims were mooted by MDOC's January 1, 2006 enactment of Rule 23. On July 21, 2006, the magistrate judge issued an Amended R&R determining that Rule 23 acceptably modified Rule 22, making an injunction unnecessary. Jones then objected to the Amended R&R.

On September 28, 2005, the district court adopted the magistrate judge's R&R but rejected his Amended R&R. The court explained that although Defendants had established that Rule 23 reflected the legitimate government interest of preventing prisoners' abusive UCC filings, the rule was impermissibly vague because it denied inmates access to the full range of "non-scholarly" UCC publications without providing them alternative means to exercise the right to access UCC publications for *lawful* purposes:

> The added language of [Rule 23] limits UCC materials, which could be used to harass or threaten another individual, including the filing of a lien against the individual. Although this policy does not appear to be related to the "security" of the prisons, the policy may be addressing the prison's "other legitimate penological objectives"-"harassment" and "felony" activities, as argued by Defendants. The added language allows confiscation of UCC materials relating to a lien to be placed on "another" individual, which is a vague term. Although defendants in their summary judgment motion submitted examples of two other prisoners who may have placed or attempted to place liens against two individuals who appear to be employed with the State of Michigan, there is no affirmative evidence or statement by the two individuals identified that these liens were in fact improper or illegal or that the prisoners were successful in filing the liens. Defendants also do not cite any authority or statute (federal or state) that shows the filing of a lien against "another" individual is prohibited or is a "felony" as argued by Defendants. The added language is vague as to the "individual" the policy attempts to protect and does not limit the filing of a lien which may be legitimate or legal.

(JA 341-42.)  The district court then enjoined Defendants' enforcement of Rule 23, pending resolution of the parties' dispute.

Defendants subsequently moved for rehearing or reconsideration based on an alleged "palpable defect" in the district court's decision.  Defendants argued that Rule 23 is narrowly tailored to prevent MDOC prisoners from committing fraudulent acts against individuals and that it did not unconstitutionally infringe on prisoners' abilities to obtain lawful liens or to possess forms, pamphlets, and other items that could facilitate the commission of fraudulent prisoner activity.  On April 13, 2007, Defendants filed a supplemental brief in support of their motion, citing two recent Michigan federal district court decisions involving similar issues: *Mitchell v. Caruso*, No. 06-11567, 2006 WL 3825077, at *3 (E.D. Mich. Dec. 26, 2006) (finding moot plaintiffs' claim that DOM 2005-4 violated prisoners' First Amendment rights where the rule was superseded by Rule 23, and plaintiffs had not brought claims under Rule 23 itself) and *Hardin v. Michigan Department of Corrections*, No. 1:06 CV 430, 2007 WL 1975102, at *6 (W.D. Mich. Mar. 27, 2007) (concluding that the fact that MDOC did not permit plaintiff prisoner to possess UCC-related materials sent to him by an "Ambassador of the Washitaw Nation of Moors" did not violate his First Amendment right to freely practice his religion because MDOC's confiscation of UCC-related materials was reasonably related to a legitimate penological interest).

On September 28, 2007, the district court denied Defendants' motion for reconsideration.  The court found that though Defendants had cited specific instances of UCC fraud committed by MDOC prisoners against Michigan employees, "Defendants fail[ed] to adequately address the [c]ourt's concern regarding Rule 23's overinclusiveness and d[id] not address underinclusiveness at all." (JA 455.)  The court explained:

> Defendants acknowledge Rule 23's overinclusiveness, but suggest that the MDOC has a process, already in place, that is capable of sifting out legitimate UCC-related prisoner mail.  Defendants assert that, if a prisoner believes that his UCC-related mail has been inappropriately confiscated, there is a process by which he may request a hearing to determine the appropriateness of the confiscation.  The Court is not

convinced that such a remedy, which is the same relief available to a prisoner for "any [type of] rejected or confiscated material," is well-suited for prisoners seeking relief from Rule 23. *Courts must ensure that prisoners are afforded greater First Amendment protection for their legal mail than with other items. Moreover, there is a heightened First Amendment concern when prison officials place restrictions on legal mail. Defendants' proposed remedy does not meet this heightened test.*

(JA 455) (internal citations omitted) (emphasis added). Defendants now appeal the district court's decision and ask this Court to dissolve the injunction.

## II. ANALYSIS

### A.    Standard of review

We review for abuse of discretion, the district court's denial of Defendants' motion for reconsideration. *United States v. Brown*, 449 F.3d 741, 750-51 (6th Cir. 2006). Our interlocutory review of injunctive orders under 28 U.S.C. § 1292(a) is plenary, giving us jurisdiction to review and consider the entire record. *United States v. State of Mich.*, 940 F.2d 143, 151-52 (6th Cir. 1991). An abuse of discretion occurs when the district court relies upon clearly erroneous findings of fact, improperly applies the governing law, or uses an erroneous legal standard. *Blue Cross & Blue Shield Mut. of Ohio v. Blue Cross & Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997).

Defendants' motion for reconsideration involves the district court's issuance of Jones's request for injunctive relief, and this Court reviews a district court's decision to grant or deny a preliminary injunction for abuse of discretion. *United States v. Any & All Radio Station Transmission Equip.*, 204 F.3d 658, 665 (6th Cir. 2000). Generally, the plaintiff bears the burden of establishing his entitlement to a preliminary injunction. *See Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) ("A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."); *see also Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000) ("[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion."). In addressing a

motion for a preliminary injunction, a court should consider: (1) the likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest will be advanced by issuing the injunction. *See Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 399 (6th Cir. 1997). "These factors are not prerequisites, but are factors that are to be balanced against each other." *Overstreet*, 305 F.3d at 573.

Notwithstanding this balancing approach, "[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). In short, "because the questions of harm to the parties and the public interest cannot be addressed properly in the First Amendment context without first determining if there is a constitutional violation, the crucial inquiry often is . . . whether the [regulation] at issue is likely to be found constitutional." *Id.* (citing *Congregation Lubavitch v. City of Cincinnati*, 923 F.2d 458, 460 (6th Cir. 1991) (Because harm could be suffered by either party, and the public interest lay in the correct application of First Amendment principles, the court's decision turned on the likelihood of success on the merits.)); *see also WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (noting that "a plaintiff's claimed harm is 'inseparably linked' to the likelihood of success on the merits of plaintiff's First Amendment claim").

**B.     This Court may consider Defendants' arguments on appeal**

As a threshold matter, we must address Jones's assertion that this Court should not consider the following arguments raised by Defendants for the first time on appeal: (1) UCC materials are not "legal mail" warranting heightened scrutiny; (2) Rule 23 is rationally related to a legitimate penological purpose and does not infringe on prisoners' First Amendment rights; (3) the district court erred in its analysis of Rule 23's scholarly-materials exception; and (4) the district court failed to accord the prison officials the required deference in evaluating Rule 23. Jones asserts that a decision on the merits

would be improper where he had no opportunity to present opposing arguments or evidence.

Although this Court adheres to the general rule that "[i]ssues not presented to the district court but raised for the first time on appeal are not properly before the court,'" *see, e.g.*, *St. Marys Foundry, Inc. v. Employers Ins. of Wausau*, 332 F.3d 989, 995 (6th Cir. 2003), we have "stated that it may be appropriate to consider a new issue on appeal if it is 'presented with sufficient clarity and completeness' for us to resolve the issue." *McFarland v. Henderson*, 307 F.3d 402, 407 (6th Cir. 2002) (quoting *J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1488 (6th Cir. 1991) and *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1461 (6th Cir. 1988)). Further, we have "'most commonly'" exercised our discretion to reach issues not raised below when "'the issue is one of law, and further development of the record is unnecessary.'" *Bryant v. Dollar Gen. Corp.*, 538 F.3d 394, 400 (6th Cir. 2008) (quoting *McFarland*, 307 F.3d at 407). Because the aforementioned challenges present questions of law that require no further development of the record, we exercise our discretion to consider the merits of Defendants' arguments.

**C.     The district court erred by applying the incorrect standard of review to Rule 23**

The district court found that Rule 23 unconstitutionally limits inmates' right to send and receive "legal mail" and reviewed the rule under a heightened standard, rather than under the standard typically applied to challenged prison regulations. For the reasons that follow, we find that the district court applied the wrong standard of review to its analysis of Rule 23.

The Supreme Court has identified four factors generally relevant to determining the reasonableness of a challenged prison regulation (the "*Turner* factors"):

1.     there must be a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

2.     there must be alternative means of exercising the right that remain open to prison inmates;

3.      we must consider the impact that accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally; and

4.      there must not be alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Turner v. Safley*, 482 U.S. 78, 89-91 (1987).  Failure to satisfy the first factor, renders the regulation unconstitutional without regard to the remaining three factors.  *Id*.  If the first factor is satisfied, the remaining factors are considered and balanced together as "guidelines" by which the court can assess whether the challenged actions are reasonably related to a legitimate penological interest.  *Id*.

The Supreme Court has made it clear that prison inmates retain all First Amendment rights not incompatible with their status as prisoners, "or with the legitimate penological objectives of the corrections system." *Pell v. Procunier*, 417 U.S. 817, 832 (1974).  The Court has recognized that receiving mail from an outside source, an interest in communication shared by prisoners and their correspondents, is such a First Amendment right.  *Procunier v. Martinez*, 416 U.S. 396, 417 (1974) (holding that a prison's decision to censor or withhold delivery of a particular letter—incoming or outgoing—must be accompanied by minimum procedural safeguards).  "Accordingly, the [ ] Court has held unconstitutional the censorship of prisoner mail when prison officials censor simply by indulging their 'personal prejudices and opinions,' while purporting to apply constitutional standards." *Brooks v. Seiter*, 779 F.2d 1177, 1180 (6th Cir. 1985) (quoting *Procunier*, 416 U.S. at 415, and noting that the decision in that case "squarely rested on an analysis of the nature of personal correspondence").

This Court has held that a review of regulations governing "legal mail" is subject to a heightened standard.  *See Sallier v. Brooks*, 343 F.3d 868, 873-74 (6th Cir. 2006) (finding that legal mail is entitled to a heightened level of protection to avoid impinging on a prisoner's legal rights, the attorney-client privilege, and the right to access the courts); *accord Kensu v. Haigh*, 87 F.3d 172, 174 (6th Cir. 1996) ("The right of a prisoner to receive materials of a legal nature, which have impact upon or import with respect to that prisoner's legal rights and/or matters, is a basic right recognized and

afforded protection by the courts . . . ."); *see also Jenkins v. Huntley*, 235 F. App'x 374, 376 (7th Cir. 2007) (finding that prison officials risk violating an inmate's constitutional rights if they open an incoming letter marked as "legal mail" outside of his presence); *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003) ("In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail . . . ."). Policies regarding outgoing legal mail receive heightened scrutiny under which a prison's inspection policy must "further an important or substantial government interest unrelated to the suppression of expression" and must not limit First Amendment freedoms "greater than is necessary or essential to the protection of the particular governmental interest involved." *Bell-Bey v. Williams*, 87 F.3d 832, 838 (6th Cir. 1996) (quoting *Procunier*, 416 U.S. at 396).

Nonetheless, not all outgoing mail is "legal mail," and we have held that "the question of what constitutes 'legal mail' is a question of law." *Sallier*, 343 F.3d at 871. The Michigan Administrative Code defines "legal mail" as correspondence with courts, attorneys, public officials, the office of the legislative corrections ombudsman, the department of correction's central office staff, and staff of the institution in which the prisoner is incarcerated. *See* Mich. Admin. Code R. 791.6603(7) (Nov. 15, 2008). We have clarified that while mail to a prisoner's attorney or a court relating to his or her legal claims constitutes "legal mail," correspondence with the American Bar Association ("ABA"), county clerks, or registrars of deeds does not because it generally "d[oes] not contain confidential, personal or privileged material." *Sallier*, 343 F.3d at 875-78; *cf. Jensen v. Klecker*, 648 F.2d 1179, 1183 (8th Cir. 1981) (concluding that a letter from the National Prison Project bearing an attorney's name and stamped "Lawyer Client Mail Do Not Open Except in Presence of Prisoner" came within the definition of protected attorney-client legal mail).

Here, the district court erred by applying heightened review when the UCC-related materials at issue are not "legal mail." The confiscated letter Jones attempted to mail to the Michigan Secretary of State's office, requesting information about copyrighting and trademark registration in Michigan, resembles the correspondence with

the county clerk that we previously determined was not "legal mail" in *Sallier*. 343 F.3d at 876. The fact that Jones's letter was addressed to the Secretary of State, a "public official," does not change our analysis. Although, as we have noted, the Michigan Administrative Code provides that mail to "public officials" warrants additional protections, the case-law suggests that this does not encompass "general communications" with public officials that do not implicate the right to petition for grievances and the right of access to the courts. *See, e.g.*, *Jenkins*, 235 F. App'x at 376 (finding that inmate's correspondence with officials from the Illinois Attorney Registration and Disciplinary Commission was not "legal mail"); *Witherow v. Paff*, 52 F.3d 264, 265-66 (9th Cir. 1995) (holding that prison regulation requiring that mail sent from inmates to certain public officials be visually inspected does not violate inmates' First Amendment rights); *Lee v. Tahash*, 352 F.2d 970, 973 (8th Cir. 1965) (concluding that inmate did not have right to send communications to "any public officials throughout the United States" making requests for general information and numerous federal and state statutory sections, chapters, codes, procedural rules, and court decisions); *cf. Taylor v. Sterrett*, 532 F.2d 462, 471 (5th Cir. 1976) ("[L]etters addressed to courts, *public officials*, or an attorney when the prisoner challenges the legality of either his criminal conviction or the conditions of his incarceration are . . . sui generis in both logic and case law.") (emphasis added).

The documents set forth in Defendants' Exhibit C in support of their Motion for Summary Judgment do not constitute "legal mail" either. *See supra* at I.B. Because those documents all relate to the administrative process of perfecting a security interest and enforcing that interest through the Secretary of State's office, and they do not implicate Jones's constitutional right of access to the courts, they are not entitled to greater First Amendment protections. *Sallier*, 343 F.3d at 876.

Finally, it bears mention that both the Third Circuit and a Michigan federal district court have recently concluded that the challenged types of UCC-related materials are not "legal mail." *See Monroe v. Beard*, 536 F.3d 198, 208 (3d Cir. 2008) (upholding Pennsylvania prison regulation providing for the confiscation of UCC-related materials,

publications, and information on copyrighting names because "plaintiffs still [had] available to them a wide range of legal materials and publications that do not pertain to the filing of fraudulent liens"), and *Edmonds v. Sobina*, 296 F. App'x 214, 217-18 (3d Cir. 2008) (upholding Pennsylvania prison regulation providing for the confiscation of UCC-related materials, publications, and information on copyrighting names and finding that regulation did not impinge on prisoners' rights to possess publications and legal materials in general); *Umbarger v. Caruso*, No. 2:06-cv-141, 2006 WL 2039979, at *7 (W.D. Mich. July 19, 2006) (determining that plaintiff's UCC materials were not "legal mail" where they were not clearly marked as "mail from an attorney or law firm, a legitimate legal-service organization, a non-prisoner paralegal working on behalf of an attorney, law firm, or legal service organization, the Department of Attorney General, a prosecuting attorney's office, a court or a clerk of the court").

For all these reasons, the district court's application of the heightened scrutiny applicable to outgoing "legal mail" was in error. Defendants argue that our inquiry should end here and that we should vacate the injunction and remand the issue to the district court for analysis under the proper standard. We disagree.

Defendants are correct that "[g]enerally, a panel entertaining a preliminary injunction appeal decides only whether the district court abused its discretion in ruling on the request for relief and does not go into the merits any further than necessary to determine whether the moving party established a likelihood of success." *Rogers v. Corbett*, 468 F.3d 188, 192 (3d Cir. 2006); *see also* Wright & Miller, 11A Fed. Prac. & Proc. Civ. 2d § 2962 (West 2009) ("In general, when the appellate court determines that the trial court's order denying injunctive relief was erroneous, it will reverse and remand the case for further proceedings below."); *Able v. United States*, 44 F.3d 128, 132 (2d Cir. 1995) ("Rather than applying the 'likelihood of success' standard ourselves, however, we believe that the wiser course is to allow the district court to make the determination in the first instance."). However, 28 U.S.C. § 1292(a)(1), which governs appeals of interlocutory orders granting or denying injunctions, provides courts of appeal with jurisdiction to reach the merits, at least where there are no relevant factual disputes

and the matters to be decided are closely related to the interlocutory order being appealed. *See, e.g.*, *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 757 (1986) (noting that appellate review on the merits of the issuance of an injunction is proper "if a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance"); *Doe v. Sundquist*, 106 F.3d 702, 707-08 (6th Cir. 1997) (finding that reaching the merits was "in the interest of judicial economy," since "the legal issues have been briefed and the factual record does not need expansion"); *Burk v. Augusta-Richmond County*, 365 F.3d 1247, 1256-57 (11th Cir. 2004) (on interlocutory appeal from the district court's denial of a preliminary injunction, the court determined that the appeal presented pure questions of law and struck down the county's permitting requirement for public demonstrations on First Amendment grounds); *Am. Civil Liberties Union v. Mukasey*, 534 F.3d 181, 187-88 (3d Cir. 2008) (noting that "[i]f a preliminary injunction appeal presents a question of law and the facts are established or of no controlling relevance, the panel *may* decide the merits of the claim") (quoting *Pitt News v. Pappert*, 379 F.3d 96, 104-05 (3d Cir. 2004)).  Thus, because the record in this case contains the facts necessary to decide whether Jones's claim warrants an injunction of the enforcement of Rule 23, we will review the merits of Jones's preliminary injunction motion.

**D.    Analysis of Jones's preliminary injunction motion**

As noted *supra*, a court's decision on whether to grant a motion for preliminary injunction involves a balancing of the following factors: (1) the likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not granted; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the injunction advances the public interest. *See Six Clinics Holding Corp.*, 119 F.3d at 399; *see also Overstreet*, 305 F.3d at 573.

     *1.     Likelihood of success on the merits*

       *a.  Application of the* Turner *factors*

To determine the likelihood that Jones will succeed on the merits of his claim that Rule 23 violates his First Amendment right to communication, *see Brooks*, 779 F.2d at 1180, we must apply the *Turner* factors. *See Turner*, 428 U.S. at 85, 89 (holding that "[W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests."); *see also supra* Part II.C (setting forth the *Turner* factors). Importantly, the *Turner* standard is not a "least restrictive alternative" test requiring prison officials "to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *See Flagner v. Wilkinson*, 241 F.3d 475, 484 (6th Cir. 2001). Issues involving "the adoption and execution of policies and practices that in [the] judgment [of prison officials] are needed to preserve internal order and discipline and to maintain institutional security" in most circumstances "should be accorded wide-ranging deference." *Id*. at 481 (citing *Bell v. Wolfish*, 441 U.S. 520, 545 (1979)).

With respect to the first factor—whether there is a valid, rational connection between the regulation and a legitimate government interest—Jones concedes that Rule 23 furthers the legitimate government interest of preventing prisoners from committing fraud under the UCC. *See Lewis v. Caruso*, No. 1:08-cv-28, 2008 WL 4283652, at *4 (W.D. Mich. Sept. 10, 2008) ("The abusive practice of prisoners filing baseless liens and/or UCC financing statements for the purpose of harassment and credit impairment of the alleged debtor (almost always a state or federal official involved with securing the prisoner's incarceration) is well documented.") (citing numerous cases of prisoners' fraudulent use of the UCC to harass government employees); *Johns v. Mich. Dep't of Corrs.*, No. 1:07-cv-95, 2008 WL 4712360, at *11 (W.D. Mich. Feb. 21, 2008) ("[P]rison officials have a penological interest in preventing inmates from possessing materials that may promote criminal activity.").

As to the second factor—whether Rule 23 leaves Michigan inmates other opportunities to access UCC-related materials—Defendants argue that "by limiting the

allowable works to 'scholarly' and statutory materials, [Defendants] exclude[] all inmate-generated how-to manuals on fraudulent liens and other UCC abuses, as well as forms generated for UCC abusive filings, but allow[] in legitimate publications that address the UCC in general." (Defs.' Br. 27.)  Moreover, Defendants contend that, should a prisoner's UCC-related materials be confiscated or rejected, Rule 23 allows him to request a hearing on the issue, and the appeal from that hearing involves the same MDOC three-step grievance procedure an inmate would use to contest the rejection or confiscation of any other mail.  Jones counters that, Rule 23 prevents access to legitimate UCC publications that can be understood by "unsophisticated prisoners," as opposed to treatises and statutes that are beyond their level of comprehension.  For the reasons that follow, we are inclined to side with Defendants on this issue.

Other Michigan federal district courts have found that MDOC PD 05.03.11 affords prisoners reasonable alternatives for prohibited UCC-related material such that it does not infringe on their First Amendment rights. *See Strickland v. Caruso*, 2008 WL 696607, at *4 (W.D. Mich. Mar. 13, 2008) ("The resources of the MDOC are limited and the Court must accord 'wide-ranging deference' to the solutions implemented by prison officials to combat the very serious problem of UCC-related fraud perpetrated by prisoners."); *Hudson v. Mich. Dep't of Corrs.*, No. 2:08-cv-208, 2009 WL 56759, at *8 (W.D. Mich. Jan. 8, 2009) (finding that MDOC prisoners had adequate alternatives because they could read a "wide variety of other political, economic, philosophical and legal materials," and that because they are prohibited from engaging in business or commerce while incarcerated, they had "no need to possess UCC material"); *Hardin*, 2007 WL 1975102, at *6 (finding that policy preventing prisoners from possessing "books, pamphlets, forms or other material regarding actions that can be taken under the UCC," while still permitting them to possess publications from the law library setting forth the statute or providing a scholarly legal analysis of the UCC, was not unconstitutional); *Lewis*, 2008 WL 4283652, at *4.  We find the analysis in *Lewis v. Caruso* to be particularly instructive.  There, the district court found that Rule 23 satisfied the second *Turner* factor, reasoning:

> The MDOC mail policy represents a rational means by which to achieve the legitimate goal of preventing prisoners from engaging in fraudulent and illegal behavior. While [the Policy Directive] prevents prisoners from possessing "books, pamphlets, forms or other material regarding actions that can be taken under the UCC," prisoners were still permitted to possess "publications in the law library, such as Michigan Compiled Laws Annotated, that set forth the statute or provide a scholarly legal analysis of the UCC." The Court concludes, therefore, that there exists a "valid, rational connection" between the policies at issue and a legitimate government interest.

2008 WL 4283652, at *4.

Jones's argument that the effectiveness of an administrative hearing to determine whether MDOC officials used Rule 23 in violation of a prisoner's First Amendment rights is undermined by the rule's inherent vagueness is not well-taken. Unlike the cases on which Jones relies, in which courts invalidated ordinances because the bounds of official discretion were "defined so imprecisely" as to invite action in violation of the First Amendment, *see, e.g.*, *Leonardson v. City of East Lansing*, 896 F.2d 190, 196 (6th Cir. 1990), here, Rule 23 is not so vague that it would allow MDOC officials unbridled discretion to impermissibly ban materials. In *Leonardson*, this Court struck down an ordinance that allowed the town mayor to establish a police line to prevent a political demonstration if it was "necessary" to "prevent, suppress, or contain" any event that may become a public disturbance. *Id*. at 197. We determined that the ordinance lacked "a meaningful and explicit" standard setting forth the circumstances under which the mayor could establish a police line to suppress events. *Id*. We noted that the broad language would allow the mayor to suppress events that enjoy First Amendment protection based merely on his belief that a public disturbance would occur, explaining:

> The mayor's order need not be conditioned upon the existence of an imminent threat of property destruction or violence or upon any other meaningful and explicit standard. Accordingly, [the ordinance] impermissibly delegates discretionary authority to the chief of police and mayor to inhibit the exercise of First Amendment freedoms by enforcing the [o]rdinance in an arbitrary and discriminatory manner.

896 F.3d at 198 (citing *Kolender v. Lawson*, 461 U.S. 352, 361 (1983)).

Here, Rule 23 is not so vague that MDOC officials conducting an administrative hearing would be able to exclude materials for impermissible reasons. *See Thompson v. Campbell*, 81 F. App'x 563, 567 (6th Cir. 2003) (upholding regulation where it permitted "a broad range of publications to be sent, received, and read," allowing prisoners alternative means to exercise their rights to receive and read publications); *see also Carlton v. Fassbender*, 996 F.2d 1214 (6th Cir. 1993) (Table) (upholding MDOC's contraband-hearing procedure against constitutional challenge by a prisoner alleging that the procedure violated his rights to due process and to access the courts). Moreover, whereas *Leonardson* involved the evaluation of a city ordinance, we must include in our analysis, the fact that this case involves the evaluation of a *prison* regulation. *Jones v. Campbell*, 23 F. App'x 459, 463 (6th Cir. 2001) ("[C]ourts should be particularly conscious of the measure of judicial deference owed to corrections officials in gauging the validity of a regulation.").

Under the third *Turner* factor, we must consider the "impact accommodation . . . will have on guards and other inmates, and on the allocation of prison resources generally." *Washington v. Harper*, 494 U.S. 210, 225 (1990). Defendants argue that the injunction would drain prison resources and distract prison staff from their responsibilities by requiring them to attend to inmates' fraudulent liens. Defendants rely on the affidavit of Richard Stapleton, an administrator in MDOC's Office of Legal Affairs, which provides that inmates engaging in UCC abuse may intimidate staff from performing necessary functions or distract public officials from their duties. The affidavit also sets forth detailed descriptions of examples of situations where MDOC prisoners filed fraudulent UCC documents to harass prison staff prior to Rule 23's enactment.

However, Defendants' arguments are undermined by the fact that reasonable alternatives to Rule 23 exist at what appears to be a minimal cost to MDOC. As our analysis of the fourth *Turner* factor stresses, effective rules have been developed that allow prisoners to receive a broad range of UCC-related materials while still limiting fraudulent filings. Thus, an injunction of Rule 23 would have little practical effect on

Defendants. Under the fourth *Turner* factor, the prisoner bears the burden of challenging a regulation by showing that there are obvious and easy alternatives to the regulation in question, noting:

> the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an "exaggerated response" to prison concerns. This is not a "least restrictive alternatives test" . . . . But if an *inmate* claimant can point to an alternative that fully accommodates the prisoner's rights at de minimis cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard.

*Turner*, 482 U.S. at 90-91 (citing *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 350 (1985)). Defendants argue that the district court erred by failing to defer to MDOC prison officials' efforts to counteract the serious problem of prisoner UCC-related fraud. But Jones urges us to adopt the district court's finding that revising Rule 23 to more narrowly define the limits of prisoners' access to legitimate UCC-related materials would not impose a meaningful burden on guards and other inmates and that there are readily available alternatives.

Specifically, Jones asserts that PD 05.03.118 ¶ D(7) ("Rule 7") and PD 05.03.118 ¶ HH.3 ("Rule 3"), which MDOC enacted to prevent inmates from receiving through the mail or otherwise possessing UCC-related materials that would foster the fraudulent misconduct but allow prisoners access to a wider range of legitimate materials, are sufficient substitutes for Rule 23. Rule 7 prohibits mail that is a "threat to the security, good order or discipline of the facility, may facilitate or encourage criminal activity or may interfere with the rehabilitation of the prisoner" including "[m]ail for the purpose of operating a business enterprise from within the facility." (JA 391-92.) Rule 3 prohibits "mail advocating or promoting the violation of [a] statute or federal laws." (JA 396.) It is undisputed that Defendants have used Rules 3 and 7 to confiscate prisoners' UCC-related mail. In fact, in November 2006, MDOC officials confiscated various UCC documents from Jones himself after the prison librarian notified them that she believed Jones planned to use the documents to file a $5,000,000 fraudulent lien. The district court denied Jones's motion for contempt in which he argued that MDOC should

be sanctioned for using Rules 3 and 7 to deliberately avoid the effect of the court's injunction, noting, "MDOC does not need to rely on [Rule 23] to confiscate UCC-related materials. Although the MDOC has specifically been enjoined from enforcing Rule 23 by the Court 'the MDOC is not similarly enjoined from forbidding inmates from possessing materials which might promote criminal activity.'" (JA 458). The district court's ruling strongly suggests that Rules 3 and 7 are effective alternatives to Rule 23.

Jones also refers the Court to an October 6, 2006 email sent from Stapleton to all MDOC wardens, entitled "Notice of Preliminary Injunction/UCC Materials," that specifically directs the wardens that the injunction prevented them from confiscating prisoner mail under Rule 23, but reminds them that they could still prohibit prisoners from receiving potentially problematic UCC-related materials through other means. The email states, in relevant part:

> Effective immediately, UCC material shall not be rejected under Paragraph HH, no. 23 of PD 05.05.118.
>
> In addition, since the same criteria is used to determine whether UCC material found in a prisoner's possession is contraband or not, UCC material found in a prisoner's possession shall not be confiscated for this purpose. UCC material that is evidence of a major misconduct charge is still appropriately confiscated and processed in accordance with PD 03.03.106 "Prisoner Discipline" (for example: Insolence based on staff harassment by filing fraudulent liens).
>
> Prisoners are also still prohibited from receiving mail, or having written material in their possession, that poses a threat to the security, good order, or discipline of the facility, may facilitate or encourage criminal activity, or may interfere with the rehabilitation of the prisoner. UCC material that can no longer be rejected under [Rule 23], and is not evidence of a misconduct, may still otherwise violate policy based on the nature of the specific material received. Therefore, if any UCC material is received in the mail or found in a prisoner's possession which would have been rejected or confiscated under [Rule 23], Norma Killough[, of Corrections Facilities Administration,] is to be contacted as soon as possible for direction on how to proceed . . . .

(Pl. Br., Ex. B.) Accordingly, through this email, MDOC concedes that wardens can (and should) continue to confiscate UCC-related materials without resorting to Rule 23.

Finally, Jones has attached a November 17, 2006 letter he wrote to Defendant Caruso, suggesting the following alternative wording of Rule 23:

> 23.      Mail or publications clearly subversive in nature, disseminated for the purpose of teaching [their] readers how to engage in fraudulent or illegal activities under the Uniform Commercial Code (UCC). Possession of blank UCC forms (e.g., UCC 1 "financial statements" etc.) are [sic] also prohibited; except where there is a clear need to file genuine UCC[-]related claims. Nonsubversive UCC publications, legal and nonlegal material are permitted and *shall not* be restricted solely on the basis of content (i.e., copyright, trademark, patent or other UCC information.)

(Pl. Br., Ex. A.)[3]  Though we are not suggesting that Defendants should adopt Jones's preferred wording, the fact that the record includes no evidence that Defendants responded to Jones's letter indicates that they have not seriously considered ways to rewrite the rule that would put an end to this dispute.

We are aware that "[t]he resources of the MDOC are limited and the Court must accord 'wide-ranging deference' to the solutions implemented by prison officials to combat the very serious problem of UCC-related fraud perpetrated by prisoners." *Marr v. Caruso*, No. 1:07 CV 745, 2008 WL 4426340, at *5 (W.D. Mich. Aug. 22, 2008) (finding that prison policies used to reject prisoner mail relating to fraudulent UCC filings satisfied the *Turner* factors).  However, MDOC's implementation of other permissible methods used to confiscate prisoners' UCC-related materials, including those of Jones himself, is clear evidence that Defendants have alternative means of affecting Rule 23's intended purpose—preventing prisoners' fraudulent UCC filings. Moreover, should MDOC face any internal problems resulting from targeting prisoners' UCC-related materials through other means, the record suggests that they would be de minimis.  *O'Lone*, 482 U.S. at 350 (1985) ("Prison officials need not show that 'no reasonable method exists by which [prisoners'] rights can be accommodated without

---

[3]As noted *supra*, Rule 23 prohibits, "Mail regarding actions that can be taken under the Uniform Commercial Code (UCC) *which could be used to harass or threaten another individual, including the filing of a lien against the individual*. This does not include legal materials which set forth the statute or provide a scholarly legal analysis of the UCC." (JA 399-401) (emphasis added).

creating bona fide [prison] problems.'"). The October 2006 internal email states that any prison official who encounters potentially problematic UCC-related material, should immediately notify the prison administrators. It is unlikely that this alternative will impose more than a de minimis cost on Defendants. *Cf. Mauro v. Arpaio*, 188 F.3d 1054, 1062 (9th Cir. 1999) (finding that proposed exceptions to prison's ban on certain sexually explicit materials—an inmate reading room for sexually explicit materials and psychological testing to determine which inmates are "fit" for receipt of such materials—imposed "more than a de minimis cost on valid penological interests" and were therefore "inadequate alternatives" to the prison's policy). Further, Defendants do not account for the fact that Michigan passed a 2004 law making the filing of fraudulent UCC financing statements with the Secretary of State a felony. *See supra* at I.A.2 (explaining the background of Mich. Comp. Laws § 440.9501(6)). This provides yet another tool MDOC can use to prevent the abuses that Rule 23 was designed to address. In short, the record demonstrates that Defendants can and do regulate Michigan prisoners' UCC-related materials without the use of Rule 23, so the third and fourth *Turner* factors favor Jones.

On balance, the *Turner* factors appear to favor Jones, and we are not convinced that Rule 23 is necessary to further Defendants' undoubtedly legitimate interest in preventing prisoners from filing fraudulent UCC liens. Thus, we find that Jones is likely to succeed on the merits of his First Amendment claim.

### b. *Vagueness*

We also must consider Jones's likelihood of success on the merits of his vagueness claim. In his Complaint, Jones asserted that DOM 2004-8[4] was "facially unconstitutionally overbroad," (JA 16), regulating legitimate UCC-related materials as well as those related to unlawful or fraudulent activities. In a footnote in the R&R, the magistrate judge explained that although he believed that the regulation was overbroad,

---

[4]Because DOM 2004-8 was superseded by Rule 22, followed by Rule 23, for the purposes of this analysis, we have construed Jones's overbreadth claim as a challenge to Rule 23. *See Haines*, 404 U.S. at 520; *Franklin*, 765 F.2d at 85.

Jones was better off challenging Rule 23 under a "void-for-vagueness analysis."  (JA 298).  The magistrate judge reasoned:

> Although [Jones] has framed his attack on the directive on the basis of overbreadth (and I agree that it is overbroad) this alone is insufficient to find a constitutional violation.  Overbreadth has little or no role "in civil litigation dealing with prisons' internal operations.  Some open-ended quality is essential if a prison is to have any guidelines; it is impossible to foresee all literature that may pose a threat to safety and security." *Borzych v. Frank*, 439 F.3d 388 (7th Cir. 2005) (internal citations omitted).  However, the policy directive . . . lends itself to a "void-for-vagueness" analysis. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Bailey v. Carter*, 15 F. App'x 245, 252, 2001 WL 845446, [at] \*4 (6th Cir. 2001); *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L.Ed.2d 903 (1983) (internal citations omitted.)  However, an individual "raising a facial attack must demonstrate that the regulation is impermissibly vague in all of its applications-including its application to his case." *Walker v. McCaughtry*, 141 F. App'x 460, 462, 2005 WL 1515471, [at] \*2 (7th Cir. 2005); *Vill[.] of Hoffman Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 497, 102 S. Ct. 1186, 71 L.Ed.2d 362 (1982).

(JA 298).  The district court adopted the magistrate judge's conclusion that Rule 23 was impermissibly vague, explaining:

> The only material [Rule 23] clearly permits is access to "scholarly" UCC publications treatises written for use and study by lawyers and law students.  Does it include treatises written by a business professor at the University of Pennsylvania?  Does it include *all* UCC-related government publications composed for layman use?  Alternatively, if it were interpreted to include government publications, would publications written by non-profit organizations for *pro se* litigants be forbidden?

(JA 342-43.)

Although the district court adopted the magistrate judge's conclusion that Rule 23 was unconstitutionally vague, it appears to have issued the injunction on the basis of Jones's First Amendment right to send "legal mail," simply noting the vagueness issue as an afterthought.  Nonetheless, the fact that Jones has argued the void-for-vagueness

issue as a separate basis on which this Court could uphold the injunction makes it appropriate to consider in our evaluation of Jones's likelihood of success on the merits.

A law or regulation can be deemed unconstitutionally vague if "men of common intelligence must necessarily guess at its meaning and differ as to its application . . . ." *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926). Although the vagueness doctrine was originally used to invalidate—on due process grounds—penal statutes that failed to "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited," *Kolender v. Lawson*, 461 U.S. 352, 357 (1983), courts have frequently applied it in the First Amendment context. *See, e.g., Kreimer v. Bureau of Police for the Town of Morristown*, 958 F.2d 1242, 1266 (3d Cir. 1992) (noting that a vagueness challenge can nullify an ambiguous law that "chills" protected First Amendment activities). However, it is well-settled that a party whose conduct is legitimately regulated by a statute or regulation lacks standing to challenge it on the basis that it is unconstitutional as applied to others. *See, e.g.*, *Parker v. Levy*, 417 U.S. 733, 755-57 (1974) (concluding that where appellee knew that his public statements violated the regulations in question, he had no standing to challenge them as unconstitutionally vague); *United States v. Hill*, 167 F.3d 1055, 1064 (6th Cir. 1999) (finding that defendant had no standing to argue that gambling statutes were void for vagueness where he had fair notice that his conduct was prohibited by those statutes); Wright & Miller, 13A Fed. Prac. & Proc. Juris. 3d § 3531.9.4 (West 2008) ("Regularly, a party whose conduct is legitimately regulated by a statute asserts that it should be stricken down because it is unconstitutional as applied to others. Such invitations to consider situations not directly before the court ordinarily are rejected.").

Jones knew that his UCC-related materials violated MDOC's Policy Directive. In fact, his Complaint expressly states that following the enactment of DOM 2004-8, (which was soon superseded by Rules 22 and 23), "Plaintiff additionally made Defendant Trombley aware that he was a certified paralegal, and that he possessed books, pamphlets and other materials that *directly covered subject matter related to the use of (UCC) which was now deemed prohibited by the DOM 2004-8*." (JA 14)

(emphasis added). Given that Jones clearly understood that Rule 23 prohibited the UCC-related materials he possessed, he has no standing to raise a vagueness claim on behalf of other MDOC prisoners, and the district court lacks subject matter jurisdiction to consider the claim, precluding the possibility that Jones could succeed on its merits.

### 2.    *Irreparable injury*

While the "likelihood of success" prong is the most important to our analysis and often determinative in First Amendment cases, *see Connection Distrib.*, 154 F.3d at 288, we proceed to consider the other three prongs of the preliminary injunction analysis as they relate to Jones's claims.

Rule 23 implicates Jones's First Amendment rights, and the Supreme Court has long held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *See Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also G&B Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994) ("[V]iolations of [F]irst [A]mendment rights constitute per se irreparable injury."); *Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) ("[E]ven minimal infringements upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief."). Accordingly, this factor clearly favors Jones.

### 3.    *Balancing of the harms*

Next, we must balance the harm that MDOC prisoners would face from the enforcement of Rule 23 against that which Defendants would face if we uphold the injunction. The district court adopted the magistrate judge's conclusion that the possible harm to prisoners caused by Rule 23's enforcement pending resolution of the case outweighed any potential harm to Defendants from the temporary enjoinment of the rule. The magistrate judge reasoned that because Defendant Caruso could issue a superceding Director's Office Memorandum at her discretion, Defendants could "immediately replace" the rule with a "narrower but effective directive which addresses the issue at hand." (JA 304.) In fact, as noted by the magistrate judge in his amended R&R,

Defendants did quickly replace Rule 22 with the amended Rule 23, although that rule was also deemed impermissible by the district court.

Defendants argue that the potential injury to Jones from lifting the injunction while the case proceeds is minimal, and that the district court failed to consider Defendants' duty to protect the public interest. However, we believe that the balancing of the harms favors Jones. We have previously noted that:

> [T]he purpose of the [balance of harms] test is . . . to underscore the flexibility which traditionally has characterized the law of equity. It permits the district court, in its discretion, to grant a preliminary injunction even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.

*Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 104 (6th Cir. 1982). As the magistrate judge explained, a decision enjoining the enforcement of Rule 22 (and, later, Rule 23) was a temporary solution while Defendants amended the rule to conform to the court's opinion. Moreover, any claim of harm by Defendants is made less compelling by the fact that Defendants are currently combating prisoners' fraudulent use of UCC-related materials with *other* regulations, (Rules 7 and 3, for instance). *See supra* Part IV.D.1.

### 4.     *Public interest*

Lastly, we must consider whether the public interest favors the issuance of the preliminary injunction. The magistrate judge considered the issue within his analysis of balancing of the harms. As noted *supra*, the district court adopted the magistrate judge's conclusion that the public interest in preventing prisoners' abusive filings would not be harmed by the preliminary injunction because the Defendants could quickly modify Rule 22 (later, Rule 23) to prevent such filings UCC without infringing on their constitutional rights. We agree that this final factor favors Jones, but for different reasons.

We have explained that "it is always in the public interest to prevent the violation of a party's constitutional rights." *Connection Distrib.*, 154 F.3d at 288. However, we have also found that in First Amendment cases, "the determination of where public interest lies . . . is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge," *id.*, because if the regulation in question is likely to be deemed constitutional, the public interest will not be harmed by its enforcement. We have previously explained that because "the public as a whole has a significant interest in ensuring equal protection of the laws and protection of First Amendment liberties . . . the public interest would be advanced by issuance of a preliminary injunction enjoining enforcement of those portions of challenged statutes that are of questionable constitutionality." *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995). Given that Rule 23 may infringe on prisoners' First Amendment rights, the injunction is in the public's interest.

   5.      *Conclusion*

Although the district court incorrectly applied a heightened level of review to Rule 23, a balancing of the relevant factors clearly demonstrates that the court's issuance of the preliminary injunction was proper. We recognize Defendants' concern over the rampant problem of prisoners' filing of fraudulent liens, and we do not question that in most cases, we defer to prison administrators' professional judgment in regard to instituting and enforcing prison policies. *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (reversing ruling invalidating an MDOC policy restricting prisoner visitation rights and emphasizing the need to defer to prison professionals); *see also Beard v. Banks*, 548 U.S. 521, 530-33 (2006) (policy of Pennsylvania Department of Corrections restricting access to newspapers, magazines, and photographs by certain inmates was justified by the need to provide particularly difficult prisoners with increased incentives for better prison behavior); *Bruce v. Ylst*, 351 F.3d 1283, 1290 (9th Cir. 2003) (noting that "federal courts must remember that the duty to protect inmates' constitutional rights does not confer the power to manage prisons or the capacity to second-guess prison administrators, for which we are ill-equipped"). Nonetheless, here, such deference is not warranted.

Defendants have not provided us with any reasons why they cannot adequately regulate prisoners' ownership and use of UCC-related materials through alternative regulations, i.e. Rules 7 and 3, Mich. Comp. Laws § 440.9501, and other prison regulations. Moreover, Defendants declined to file a reply brief in which they would have had the opportunity to contest Jones's arguments regarding their use of these alternative means of regulation. Had Defendants given us some indication that the cost of regulating UCC materials without Rule 23 was more than "de minimis," then perhaps we would view this case differently. However, our review of the record and the parties' briefing indicates that the preliminary injunction is warranted.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's preliminary injunction on its merits and **REMAND** the case to the district court for further consideration not inconsistent with this opinion.

———————————

**DISSENT**

———————————

McKEAGUE, Circuit Judge, dissenting.  In my opinion, the majority misses the forest for the trees.  Despite concluding (1) that the district court erred when it granted preliminary injunctive relief based on application of an erroneous legal standard; and (2) that Rule 23 is supported by a legitimate penological interest; and (3) that Rule 23's restriction of Jones's access to UCC materials leaves other alternative means of access readily available to him, the majority today upholds "extraordinary" preliminary injunctive interference with Michigan Department of Corrections officials' management of a "very serious problem," even in the absence of any showing by Jones of irreparable injury.  This anomalous result stems from misapplication of the four-part standard set forth in *Turner v. Safley*, 482 U.S. 78, 89-91 (1987).  I therefore respectfully dissent.

At the outset, it bears emphasis that our application of the *Turner* standard comes in the context of a motion for preliminary injunction.  Jones has the burden of establishing entitlement to such relief, by showing, *inter alia*, a substantial likelihood of success on the merits and that, absent relief, he will suffer irreparable injury.  To establish a substantial likelihood of success on the merits, Jones must show that application of the *Turner* standard weighs in favor of finding that Rule 23 is an unreasonable regulation.

The *Turner* standard is designed, in recognition of the special needs of the prison setting and in deference to prison officials' expertise and administrative judgment, to *uphold* prison regulations as valid, despite their impingement on inmates' constitutional rights, if they are reasonably related to legitimate penological interests.  *Id.* at 89.  The Supreme Court recognized that such a deferential, low-hurdle standard of review "is necessary if 'prison administrators . . . , and not the courts [are] to make the difficult judgments concerning institutional operations.'"  *Id.* (quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128 (1977)).

The majority readily acknowledges that the first factor in the *Turner* standard is satisfied by Rule 23. That is, there is a rational connection between Rule 23's restriction of prisoners' access to UCC materials and the government's legitimate interest in combating the serious problem of UCC-related fraud perpetrated by prisoners.

Consideration of the second factor, whether Jones has alternative means of access to UCC materials, is also deemed by the majority to favor upholding Rule 23. In other words, although Rule 23 impinges on Jones's right to receive UCC materials in the mail, he retains access to UCC materials in the prison law library and even retains the right to receive them in the mail by using the grievance procedure to show he has a legitimate purpose (as opposed to a fraudulent or harassing purpose) for receiving them. Thus, two alternative means of access are available and neither has been shown to be burdensome. Because Jones has readily available alternative means of exercising his rights, the burden on his rights is minimal, even trivial, and we are required to "be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." *Turner*, 482 U.S. at 90. Yet, this admonition is ignored by the majority as it considers the remaining *Turner* factors.

The third and fourth factors relate to the availability of still *other* alternative means of access. If other possible accommodations of Jones's desire to receive UCC materials in the mail would have an adverse "ripple effect" on guards, other inmates or allocation of prison resources generally, then, the Supreme Court again admonishes, we are obliged to be "particularly deferential to the informed discretion of corrections officials." *Id.* If, on the other hand, Jones identifies an easy alternative that would not pose a significant ripple effect, this could represent evidence that Rule 23 is not reasonable, but is an "exaggerated response" to prison concerns. *Id.* at 90-91. Yet, the *Turner* Court hastened to point out that this is not a "least restrictive alternative" test: "prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the claimant's constitutional complaint." *Id.*

Well, if *Turner* does not impose a "least restrictive alternative" requirement, and if, as the majority has found, Rule 23 allows at least two available and adequate

alternatives, then why should it matter whether other alternatives might also be available, even if they might be less restrictive?  And if Jones has failed to demonstrate that the existing accommodations are either burdensome or ineffective, then why should the existence of other possible accommodations that are not "shot down" by prison officials be deemed to suggest that the existing accommodations are unreasonable?

The majority does not purport to answer these questions, but sidesteps them.  Its determination that the third and fourth factors demonstrate the unreasonableness of Rule 23 is not based on evidence that other accommodations have been unreasonably denied. Rather, instead of focusing on evidence of other means of access to UCC materials, the majority turns the factors around and focuses on evidence of other means of *denying* access.  Finding that prison officials have employed various other ways of denying access without resorting to Rule 23, the majority concludes that Rule 23 is unnecessary.

In other words, instead of deferring to prison officials' discretionary authority and upholding Rule 23 because Jones has not shown that it unreasonably restricts access, the majority has usurped their authority by barring enforcement of Rule 23 because prison officials have failed to show that Rule 23 is needed, inasmuch as restriction of UCC materials is or can be effected through other means.  Or, even more plainly, the federal judicial power is invoked to intrude upon matters of state prison management not because Jones has shown that his rights are substantially abridged, but because the court, in its wisdom, has determined that it "knows better" than the prison officials—i.e., that a regulation promulgated by prison officials shall not be enforced because the work done by the regulation is also accomplished by other regulations.

In my opinion, the majority's analysis and decision run directly contrary to *Turner*'s clear and insistent teaching to let prison administrators make the difficult judgments concerning institutional operations. *Id.* at 89.  *See Beard v. Banks*, 548 U.S. 521, 531-33 (2006) (reversing Third Circuit and upholding prison regulation imposing outright deprivation of newspapers, magazines and photographs even though no alternative means of access was provided, because the real task is not to "balance" *Turner* factors, but to determine whether the regulation is a reasonable one).  The fact

that Rule 23 may represent an *additional* mechanism (i.e., in addition to other regulations used to address the same evil) through which prison officials limit prisoners' access to potentially harmful materials does not render it an "exaggerated response." The mischief caused by fraudulent and harassing lien filings can and should be addressed in multiple and diverse ways. That the ways chosen by prison officials may turn out to be cumulative or even inefficient does not justify judicial interference. Only if a person's constitutional rights are shown to be unreasonably impinged is injunctive relief warranted. Jones has not made this showing in this case. Nor has he demonstrated a substantial likelihood of success on the merits of his claim.

Moreover, Jones's showing of irreparable injury in support of preliminary injunctive relief is nonexistent. The majority is content to rely on oft-quoted language from the plurality opinion in *Elrod v. Burns*, 427 U.S. 347, 373 (1976), to the effect that "the loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury." Well, there are First Amendment freedoms and there are First Amendment freedoms. In *Elrod*, the Supreme Court held that public employees had a First Amendment right not to be fired solely because of their affiliation with a political party. That is quite a different matter than the inconvenience here visited upon Jones by Rule 23, requiring him to either visit the prison law library or demonstrate legitimate purpose in an administrative hearing to obtain desired UCC materials. Jones has not shown that obtaining UCC materials in one of these alternative ways poses such a burden on his First Amendment rights as to constitute irreparable harm. This inconvenience is at worst a temporary, incidental inhibition of First Amendment freedoms, not an irreparable injury of sufficient magnitude to justify extraordinary preliminary injunctive relief. See *City of Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983) (recognizing that principles of comity and federalism counsel against issuing injunctions against state law enforcement authorities absent showing of substantial and immediate irreparable injury).

Thus finding that Jones has shown neither substantial likelihood of success nor irreparable injury, I believe the law clearly requires us to vacate the preliminary

injunction issued by the district court as an abuse of discretion.  I therefore respectfully dissent.